Jess F. RHODES, Plaintiff-Appellant,

v.

AMARILLO HOSPITAL DISTRICT,
Defendant-Appellee.

No. 80–1217.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 4, 1981.

Judge & Brown, John Judge, Amarillo, Tex., for plaintiff-appellant.

Gibson, Ochsner, Adkins, Harlan & Hankins, James H. Doores, Amarillo, Tex., for defendant-appellee.

Before MARKEY,[*] Chief Judge, and GEE and POLITZ, Circuit Judges.

GEE, Circuit Judge:

Dr. Jess F. Rhodes filed this diversity suit for breach of contract against the Amarillo Hospital District. The district court concluded that Rhodes, not the district, had breached his employment contract and rendered judgment for the defendant district. From this adverse judgment plaintiff appeals to this court. He argues that the court below erred in its findings on breach of contract; that defendant waived any possible breach on plaintiff's part by its behavior during the course of his employment; and that he was deprived of a fair trial by the court's denial of motions for continuance, for leave to file an amended complaint, and for jury trial after waiver. He also urges this court, on its reversal of the liability finding below, to award damages in excess of $100,000. We have carefully reviewed Dr. Rhodes' complaints and find them without merit. The judgment of the district is in all respects affirmed.

## I. Facts

In March of 1976, Dr. Rhodes, a Florida physician, signed a contract with the Amarillo Hospital District[1] to serve as the community psychiatrist for the district.[2] In that capacity he was to perform administrative and supervisory services for the clinical staff, teach and counsel staff members, and treat patients in need of psychiatric care.[3]

---

[*] Chief Judge of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. Dr. Lloyd Cannedy, its executive director, negotiated the contract for the Amarillo Hospital District and signed the contract on its behalf.

2. The facts set out in this opinion are excerpted from the findings of fact entered by the district judge. Much of the dispute in the court below was over the existence of certain facts and their proper interpretation; that dispute continues in this ill-suited forum. Plaintiff-appellant's request for oral argument states: "This appeal involves a challenge not only to a trial court's conclusions of law, but also its findings of fact." Plaintiff's specific attempts to assail the factfindings will be dealt with as necessary in this opinion. As an initial matter, we have reviewed the district court's findings of fact and find them not to be clearly erroneous. Therefore, we repeat with confidence those that are relevant here.

3. The employment agreement read in pertinent part:

C. In the performance of his duties the District Physician shall...

1. Provide professional psychiatric services and supervision to the clinical staff for persons needing psychiatric, alcoholism or drug treatment as an indigent person under the regulations of the District.

a. Assist in development and supervision of specialized patient programs and psychiatric treatment modalities in accordance with the policies of the Psychiatric Department and in cooperation with the Executive Director charged with full day-to-day administrative responsibilities of the District.

b. Provide psychiatric consultation and utilization review services for District patients, including patients who have been referred to other health care institutions for District care.

c. Provide psychiatric services for patients, with no psychiatrist, referred by the court and law enforcement agencies for evaluation and commitment.

2. Consultation and Education Services.

a. Provide medical consultation and interservice education for employees of the District and volunteers involved in the delivery of direct services to patients requiring psychiatric care.

At the execution of this contract Dr. Rhodes was not licensed to practice medicine in the State of Texas. Dr. Cannedy, the district's executive director, had learned of Rhodes' nonlicensure during the contract negotiations. Cannedy testified at trial that he had assumed that Rhodes would be licensed before beginning his contract duties. Dr. Rhodes testified that he made clear to the district his unwillingness to seek state licensure until the contract was in hand. Whether the district, through Dr. Cannedy, thought Rhodes had his Texas license on March 1 or was aware he still had not acquired it is essentially irrelevant for purposes of our discussion. If not before, very shortly after the execution of the employment contract, Dr. Cannedy learned of Dr. Rhodes' unlicensed status. The district court found that Rhodes did not notify Cannedy on March 1 that he had not yet initiated the application process. The problem was not then acute; some weeks of formal orientation necessarily preceded the full assumption of duties by Dr. Rhodes. The expectation of all concerned was that Dr. Rhodes would be licensed presently.

Rhodes immediately entered into that portion of his duties for which no medical license was required; he did not, as under state law he could not, treat psychiatric patients or otherwise "practice medicine." Officials of the district remained concerned with Rhodes' nonlicensure and assisted him, chiefly through the provision of secretarial help, in his dilatory efforts to complete the forms and follow the procedures necessary for licensure. After three months' delay, Dr. Cannedy, dissatisfied with an employee unable to perform his duties fully, sent plaintiff a letter on June 1, 1976, that constituted the four-week written notice of contract termination stipulated in Article F of the employment contract.[4] Dr. Cannedy's letter read, in pertinent part:

This action is taken consistent with Article F of our agreement and will culminate on July 1, 1976, with contract termination for the following reasons:

Article C, Part 1: The physician has not provided psychiatric service for persons needing psychiatric, alcohol, or drug treatment as an indigent person under the regulations of the district.

Article C, Part 1, c: The physician has not provided psychiatric services for patients with no psychiatrist, referred by the Court and law enforcement agencies for evaluation and commitment.

Article C, Part 5: The physician has not worked in the Psychiatric Clinic.

Article F: The physician has not made application for active staff privileges at the District.

As we discussed in the above referenced conversation, this noncompliance with the terms of our agreement is due largely to your failure to obtain the legal ability, through licensure or temporary permit or

---

b. Provide educational services for the Northwest Texas Hospital School of Nursing and other affiliating educational programs.

3. Provide other such services as may be mutually agreed upon.

4. Render or supervise psychiatric services to those who request help with psychiatric problems, who do not have a private physician, and who present themselves at facilities with programs which are the responsibility of the District during the hours of Physician's assigned duty.

5. Devote his best professional skill and ability to the work. Any questions pertaining to the quality of practice shall be reviewed in accordance with the medical staff and hospital bylaws. The work of the physician in the Psychiatric Clinic and in the hospital shall comply with the rules and regulations pertaining to medical and administrative practice as may be adopted by the Staff and the Board of Managers of the Hospital District.

4. Article F read:

F. The Physician shall make application for active staff privileges in good standing on the medical and dental staff of the AMARILLO HOSPITAL DISTRICT. If accepted he shall have all the rights, privileges and responsibilities of staff membership including admitting indigent patients to appropriate clinical department if such rights, etc., are granted by said District. His failure to maintain staff membership if accepted or his failure to comply with the terms of this Agreement or the rules and regulations of the hospital, and his failure to remedy any such failure after four (4) weeks written notice shall be cause for the termination of this Agreement by the Executive Director.

other means, to practice medicine in Texas. At such time as you can provide assurance of your ability to meet the above terms, I remain ready for discussion at your convenience.

After receiving this letter, Dr. Rhodes completed the application process. The State Board of Medical Examiners approved his application for reciprocity licensure and issued a temporary license on June 25, 1976, which Dr. Rhodes received on June 30. He did not then begin treating psychiatric patients of the Amarillo Hospital District. On July 2, the day following that set in the June 1 letter as the date for termination, Rhodes met with Cannedy and presented his license. Cannedy replied, "Go to work." This Rhodes declined to do unless provided with a written rescission of the June 1 notice of termination. Upon Cannedy's failure to provide him this second letter, Rhodes refused to perform the services required by the contract and left Amarillo. Plaintiff, once again a Florida resident, then filed suit on May 20, 1977.

## II. Breach of Contract

■ Dr. Rhodes advances two arguments against the finding that he, not the district, breached the employment agreement. He first argues that no state medical license was necessary to the performance of his contract duties and that for four months he fully performed those required services. This argument is absurd; stripped to its essentials, it maintains that plaintiff was not hired to practice psychiatry. Trial testimony, contract terms, and simple logic are to the contrary. On cross-examination Dr. Rhodes admitted several times that his contract duties included the treatment of patients in need of psychiatric care.[5] In argument to this court, plaintiff makes much of the fact that during contract negotiations

he successfully struck the word "medical" and substituted "psychiatric" in the originally listed duty that he "provide professional medical services to every person needing psychiatric, alcoholism or drug treatment as an indigent person."[6] That emphasis is unpersuasive. One may argue that psychiatry is an inexact art, but the argument that its practice is not the practice of medicine needs no rebuttal beyond its restatement. The undoubted reason for Rhodes' insistence on substituting "psychiatric" for "medical" was his desire to limit his practice to his specialty;·the doctor was not interested in setting broken arms. Full performance of the contract clearly required a license to practice medicine. Indeed, Rhodes' efforts, dilatory as they were, to secure a license further belie this argument.

Plaintiff's second argument against the district court's conclusions on breach revolves around the proper characterization of the June 1 letter from Cannedy to Rhodes. Dr. Rhodes asserts that the letter constituted an anticipatory repudiation of the contract by the district and that consequently any subsequent failure on his part to perform could not put him in breach. This argument misapplies legal doctrine and misstates fact.

The doctrine of anticipatory repudiation is poorly fitted to the facts of this dispute. Typically, "anticipatory repudiation" arises when a party unequivocally renounces his duties under a contract prior to the time fixed for his performance. Whatever the act of repudiation and by whom, it was here scarcely "anticipatory." Both parties had begun performance; neither, consequently, at that late date (June 1) could anticipatorily breach the contract. Further performance theoretically could have been repudiat-

---

**5.** *See, e. g.,* transcript at 156:

  Q  And you knew that the contract would provide that you be a psychiatrist and treat *indigent patients,* didn't you, doctor?

  A  Yes.

  *See also id.* at 175–76.

  Dr. Rhodes' admissions came in the context of arguing that the parties' understanding had been that provision of such psychiatric services

was contingent on his licensure and that the district had accepted his temporary nonlicensure. The fact remains that Dr. Rhodes recognized that full performance as the district psychiatrist required him to be licensed to practice medicine in the State of Texas.

**6.** The final version of this provision is Article C, § 1, quoted at n.3, *supra.*

ed by defendant, but that situation is properly dealt with as actual, not anticipatory, breach. Furthermore, as recognized by the district court and affirmed here, the hospital district did not breach this agreement.

■ The June 1 letter was merely the four-week written notice of intent to discharge stipulated in the contract. Neither party treated it as certain termination of Rhodes' employment; by its terms it was not. During the month of June Rhodes continued his partial services to the district and finally secured a license from the state board. July 1 passed, with no termination by the district of Rhodes' employment. At their July 2 meeting, Cannedy told the now-licensed Rhodes to go to work. Rhodes, apparently misapprehending the legal effect of the June 1 notice and fearing the contract was endangered by that letter's existence, refused to work until the June 1 letter was formally rescinded. Rhodes, unschooled in contract law, stood his ground when he should have yielded. His rights under the contract were unaffected by the June 1 letter. The mere passage of time from June 1 to July 1 did not terminate his employment. Additional, affirmative action by the district was necessary to do that. Contrary to his belief, Rhodes retained enforceable contract rights and responsibilities on July 2 without any written repudiation of the June 1 letter. His refusal to render the promised psychiatric services put him in breach.

### III. *Alleged Waiver of Breach*

Dr. Rhodes argues that, if his failure to provide full psychiatric services for the district constituted a breach of contract otherwise justifying his termination, the district's employment and payment of him for four months and acceptance of his limited services constituted a waiver of it. Several grounds foreclose this argument.

■ It does not appear that Dr. Rhodes timely raised this issue of waiver in the court below. The original complaint and the pretrial order contain no mention of waiver of breach. The issue of waiver was not litigated and decided in the district court; no manifest injustice would inhere in our refusing to consider it on appeal. Even ignoring procedural irregularity, the want of substance in this waiver claim makes appellate dismissal correct. If its actions could be considered indicative of waiver, the district would have waived at most any right to recover salary paid Rhodes for the four months from March 1 to July 1. The district's patience and helpfulness to Rhodes cannot be taken as indications of an acceptance of continued partial performance by the doctor or of waiver of its right to employ a staff physician willing to practice medicine. The district's actions during the four months indicate an unwavering demand that Rhodes secure a state medical license. Finally, the months of delay and partial performance were the grounds for the June 1 notice of termination but not the sole instance of plaintiff's breach of contract. Dr. Rhodes breached his contract on July 2 with his refusal, once licensed, to perform psychiatric services for the district. Any prior actions by the district arguably indicative of waiver of plaintiff's dilatory licensure efforts cannot be construed as waiver of this subsequent breach.

### IV. *Denial of Plaintiff's Motions*

Some additional factual background is necessary to a full understanding of plaintiff's arguments here. Plaintiff, again a Florida resident at the institution of this suit on May 20, 1977, retained both Florida and Texas counsel. On June 15, 1978, in the face of disbarment proceedings, Dr. Rhodes' Texas lawyer withdrew from practice. At all times from the filing of the complaint until trial, however, plaintiff was represented at least by Florida counsel, who had signed the original complaint. Plaintiff finally retained new Texas counsel in early November 1979, seventeen months after the resignation of his initial Texas lawyer, scant days before the pretrial order was due and a month before trial. On November 16, two weeks before the date set for the pretrial conference, three weeks before trial, and thirty months after the suit's filing, plaintiff filed three motions in

the district court: for continuance, for leave to file an amended complaint, and for jury trial after waiver. The motions were denied. Plaintiff argues on appeal that the cumulative effect of denial of these motions was a deprivation of his right to a fair trial on his claim. We have considered his arguments and here reject them.

## A. Continuance.

The decision to grant or deny a continuance lies within the sound discretion of the district court. *Crompton-Richmond Co. v. Briggs*, 560 F.2d 1195 (5th Cir. 1977); *Thompson v. Fleming*, 402 F.2d 266 (5th Cir. 1968); 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2352 (1971). We have studied the circumstances and find that the trial judge did not abuse her discretion in denying a continuance. No adequate explanation is offered for plaintiff's long delay in hiring a new Texas lawyer. During the seventeen months in which plaintiff had no Texas counsel he was not without legal representation; his Florida lawyer apparently played an active role in the institution and preparation of this lawsuit. The recently retained Texas lawyer, who tried the case for plaintiff, argues that the relatively short time for preparing the case hampered his effective prosecution of plaintiff's claim. We can understand plaintiff counsel's belief that, given more time to prepare, he could have presented a better case. We, however, are in a poor position to weigh its validity, and, furthermore, we do not consider that speculative assertion a sufficient basis for finding error in the trial court's denial of this motion. It was not here an abuse of discretion for the trial judge to call a halt to delay and proceed to trial.

## B. Amendment of Complaint.

Plaintiff's second motion was for leave to file an amended complaint adding Dr. Cannedy as an individual defendant and alleging several additional, basically tort, theories of recovery [7] with a demand for exemplary damages. Federal Rule of Civil Procedure 15(a) provides that, under such circumstances as are presented here, "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Appellate review of a denial of leave to amend is limited to a determination whether the lower court abused its discretion in so ruling. *Bamm, Inc. v. GAF Corp.*, 651 F.2d 389 (5th Cir. 1981); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539 (5th Cir. 1980). The Supreme Court has established a general standard against which district courts may measure such requests. In *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the Court stated:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*See also Bamm, Inc. v. GAF Corp., supra* at 391.

The trial judge did not abuse her discretion in concluding that justice did not require receiving this amended complaint. Our conclusion here is, however, made more difficult because the trial judge cursorily denied this motion, assigning no reasons for her action. We have previously indicated the disfavor with which we view district court denials of amendments without stated reasons. *Griggs v. Hinds Junior College*, 563 F.2d 179 (5th Cir. 1977); *Hilgeman v. National Insurance Company of America*, 547 F.2d 298 (5th Cir. 1977).[8] This lapse is

---

7. In his amended complaint, plaintiff asserted claims for "tortious termination of employment," "intentional infliction of emotional distress and economic duress," and for violation of his "civil rights."

8. We repeat an admonition issued in the context of grants of summary judgment without articulated reasons but applicable here as well: "We note once again that it is difficult to fath-

unfortunate but not fatal to affirmance. The strong preference for explicit reasons yields to the presence here of ample and obvious grounds for denying leave to amend; the district court could confidently have relied on any or all of them. The mere absence under these circumstances of articulated reasons for denial does not indicate an abuse of the court's discretion.

■ The inordinate delay in filing this amendment (thirty months after the original complaint) and its timing (three weeks before trial) weigh heavily against plaintiff. This court has previously recognized that "[a]t some point in time delay on the part of a plaintiff can be procedurally fatal." *Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir. 1981). We do not imply that this delay alone would necessarily permit an exercise of discretion against plaintiff's request; but in the absence of justification for the delay, it was properly to be considered strongly against plaintiff's motion. No sufficient justification or excuse has been offered for the delay. The retention of a new attorney able to perceive or draft different or more creative claims from the same set of facts is itself no excuse for the late filing of an amended complaint. In *Summit Office Park, Inc. v. United States Steel Corp.,* 639 F.2d 1278, 1284 (5th Cir. 1981), this court noted that the intent of Rule 15(a) "is to assist the disposition of litigation on the merits of the case rather than have pleadings become ends in themselves." This was not a case in which incomplete or inadequate pleadings, uncorrected by amendment, doomed plaintiff's recovery. While seeking recovery under the headings of different tort claims, plaintiff's case remained that pled in the original breach of contract complaint. Plaintiff's claim was disposed of on its merits. The denial of leave to amend did not compromise plaintiff's chance of recovery; the facts took care of that.

om unspoken reasons, and that district courts would render better service to the litigants and facilitate the review of their actions if they would at least dictate into the record the rea-

## C. *Jury Trial.*

■ Finally, plaintiff complains of the district court's denial of his request for jury trial after waiver. It is undisputed that plaintiff waived his right to jury trial by failing to make the written demand required by Federal Rule of Civil Procedure 38(b). The rules, however, allow a party an opportunity for relief from that waiver. Rule 39(b) provides: "[N]otwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any or all issues." This court has previously stated that, "when the discretion of the court is invoked under Rule 39(b), the court should grant a jury trial in the absence of strong and compelling reasons to the contrary." *Swofford v. B & W, Inc.,* 336 F.2d 406, 409 (5th Cir. 1964). We elaborated that position in *Bush v. Allstate Insurance Co.,* 425 F.2d 393 (5th Cir. 1970), in a manner supportive of the trial court's action here. After citing and quoting the exact language from *Swofford* above, we concluded: "It is not an abuse of discretion by a District Judge to deny a Rule 39(b) motion, however, when the failure to make a timely demand for a jury trial results from mere inadvertence on the part of the moving party (citations omitted). In this case the excuse put forth by [plaintiff] was the inadvertence of both his lawyers.... [T]he District Court was not required to order a trial by jury." *Id.* at 396. "Mere inadvertence" seems a charitable description of plaintiff's delay here.

## V. *Award of Damages*

Since we have fully affirmed the district court's liability findings, there is no need to consider the question of an award of damages to plaintiff. We note that, had our conclusions on liability been contrary to those of the district court, an appellate award of damages would have been improper. Evidence on damages was presented at

sons for their [denials of leave to amend]." *Cooper v. General Motors Corp.,* 651 F.2d 249, at 250 n.1 (5th Cir. 1981).

trial but not evaluated by the trial judge because of her liability findings. Had we reversed those findings, the determination of plaintiff's damages would properly have been for the district court in the first instance. The judgment below is AFFIRMED.